**2022 BNH 004**

_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                     Bk. No. 14-11393-BAH
                                                                           Chapter 13
Davin LW Pope,
          Debtor

Davin Pope,
          Plaintiff

v.                                                                         Adv. No. 18-01011-PGC

U.S. Bank, National
Association, as Legal Title
Trustee for Truman 2012
SC2 Title Trust, and
Rushmore Loan
Management Services, LLC,
          Defendants


## MEMORANDUM OF DECISION

## I.  INTRODUCTION[1]

     Plaintiff Davin Pope took issue with her mortgage bank and its mortgage loan servicer's

treatment of the administration of her monthly mortgage payments during her chapter 13 case

and on February 13, 2018, she filed an adversary proceeding complaint against U.S. Bank,

National Association, as Legal Title Trustee for Truman 2012 SC2 Title Trust ("U.S. Bank") and

_____

[1] The court has jurisdiction over the parties and Ms. Pope's claims pursuant to 28 U.S.C. §§ 1334 and 157(a) and
Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding
in accordance with 28 U.S.C. § 157(b).  The parties have consented to the court's entry of final orders and judgment
on all claims.  Venue is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409 because Ms. Pope resides in New
Hampshire.

Rushmore Loan Management Services, LLC ("Rushmore") (Doc. No. 1) (the "Complaint").[2] The Complaint contains six counts: breach of contract by U.S. Bank (Count I), violation of the automatic stay by U.S. Bank and Rushmore (Count II), contempt of the Confirmation Order by Rushmore (Count III), contempt of the Confirmation Order by U.S. Bank (Count IV), sanctions for U.S. Bank (Count V), and a declaratory judgment regarding the Loan's fixed rate status (Count VI). Following consideration of the evidence presented during a three-day trial and the arguments asserted by the parties in their extensive post-trial briefing, the court concludes that Ms. Pope is correct, in part, as described below.

## II. FACTS & PROCEDURAL HISTORY[3]

### A. 2004 Borrowing

In early November of 2004, Ms. Pope and her husband, Jeffrey Pope, borrowed $177,600 from Wells Fargo Bank, N.A. ("Wells Fargo") to purchase their home located at 7 Donna Drive in Pembroke, New Hampshire (the "Property"). To memorialize the loan, the Popes executed a fixed rate promissory note in favor of Wells Fargo (the "Note") and to secure the Note, the Popes granted Wells Fargo a first mortgage on the Property (the "Mortgage").[4] The Note and Mortgage are collectively referred to as the "Loan."

The Mortgage contains several provisions that affect the outcome of this case. Section 1 requires the Popes to make monthly payments on the Note consisting of principal, accrued

---

[2] References to "chapter" and "§" in this opinion are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq., (the "Bankruptcy Code").

[3] The court finds the following facts pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052. See Fed. R. Civ. P. 52(a)(1); Fed. R. Bankr. P. 7052. The facts were either stipulated to by the parties, reflected on the dockets of Ms. Pope's bankruptcy cases, or found by the court following the presentation of evidence during the trial.

[4] See Joint Exhibits ("J.E.") 1 (Mortgage), 2 (Note).

interest, and escrow expenses ("Monthly Mortgage Payment" or "Monthly Mortgage Payments").

Section 2 governs the application of Monthly Mortgage Payments, providing that:

> all payments accepted and applied by Lender[5] shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3 [(escrow payments)]. Such payments shall be applied to each [Monthly Mortgage Payment] in the order in which it became due. Any remaining amounts shall be applied to late charges, second to any other amounts due under [the Mortgage] . . . , and then to reduce the principal balance of the Note.

This section also provides that if the Popes make a payment for a delinquent Monthly Mortgage Payment "which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge." If multiple Monthly Mortgage Payments are outstanding, Rushmore may apply the payments received from the Popes to the repayment of the delinquent Monthly Mortgage Payments "if, and to the extent that, each payment can be paid in full."

Section 3 requires that the portion of the Monthly Mortgage Payment for escrow expenses must be applied to pay "Escrow Items," which are defined as

> (a) taxes and assessments and other items which can attain priority over the [Mortgage] as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by [the] Lender under [the Mortgage]; and Mortgage Insurance premiums . . . .

Notably, this section does not include Monthly Mortgage Payments in the definition of Escrow Items. In other words, the Popes and their Lender agreed that the Lender and/or its servicer would not apply the Popes' monthly escrow payments to principal and interest payments.

---

[5] Although the Mortgage initially defined the "Lender" as Wells Fargo (J.E. 1), Wells Fargo later assigned the Mortgage to U.S. Bank.

Sections 13 and 20 permit the Lender to sell or assign the Mortgage and bind any successors or assigns to its terms.[6]  Section 20 also requires the parties to provide each other with an opportunity to cure alleged breaches of the Mortgage's terms prior to commencing a lawsuit. It provides in part that:

> Neither [the Popes] nor Lender may commence . . . any judicial action . . . that arises from the other party's actions pursuant to [the Mortgage] or that alleges that the other party has breached any provision of, or any duty owed by reason of, [the Mortgage] until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of section 15) of such alleged breach and afforded the other party . . . a reasonable period after the giving of such notice to take corrective action.

Finally, Section 25 permits the award of reasonable attorney's fees to the Popes pursuant to N.H. Rev. Stat. Ann. § 361-C:2 in the event that they prevail in an action, suit, or proceeding brought against their Lender.

### B.  Prior Bankruptcies

Less than a year after executing the Loan, Ms. Pope filed for bankruptcy relief pursuant to chapter 7 of the Bankruptcy Code.[7]  Although she stated her intent to reaffirm her personal obligations to Wells Fargo under the Loan during the case, she never filed a reaffirmation agreement.  Thus, her personal obligations to Wells Fargo were extinguished when she received a chapter 7 discharge in March of 2006 even though Wells Fargo retained its *in personam* claims against Mr. Pope and its interest in the Property under the Mortgage.

Three years later, the Popes commenced a chapter 13 case to stop Wells Fargo from foreclosing on the Property after they fell behind on their Monthly Mortgage Payments.[8]  During

---

[6] Although Section 20 contains an exception to this, that exception does not apply here.

[7] See In re Davin L. W. Pope, Bk. No. 05-13861-JMD.

[8] See In re Jeffrey Pope and Davin Pope, Bk. No. 09-10878-JMD.

that case, Wells Fargo moved for relief from the automatic stay due to the Popes' failure to make postpetition Monthly Mortgage Payments.  Before relief could be granted, Wells Fargo and the Popes agreed to modify the terms of the Loan by lowering the fixed interest rate on the unpaid principal balance of the Loan to 4.075% per year, thereby reducing the monthly principal and interest payments to $908.66 (the "Modification Agreement").[9]  The court confirmed their chapter 13 plan in August of 2009.  At some point, the Popes and Wells Fargo discussed a second loan modification, which would have changed the Note from a fixed rate to a variable rate, but that modification was never consummated.

The Popes completed their chapter 13 plan payments in 2013.  While Mr. Pope received a discharge on September 13, 2013, Ms. Pope was ineligible to receive a discharge due to her 2006 discharge.[10]

C.  The Assignment of the Loan and Rushmore's Loan Tracking Methodology

In August of 2013, Wells Fargo assigned the Loan to U.S. Bank.[11]  A month later, Rushmore began servicing the Loan on behalf of U.S. Bank.[12]  As the loan servicer, Rushmore was responsible for the ongoing administration of the Loan including the receipt and processing of the Monthly Mortgage Payments, addressing payment related issues, and responding to any other loan-related inquiries.

Like many mortgage servicers, Rushmore uses a loan servicing software program to monitor and service borrowers' loans— the Mortgage Servicing Platform (the "MSP").

---

[9] See J.E. 5.

[10] See 11 U.S.C. § 1328(f)(1).

[11] See J.E. 3.

[12] See J.E. 4.

Rushmore records all transactions, communications, and notes relating to a borrower's loan in the MSP.  Importantly, the MSP tracks the contractual accounting of a loan, or put another way, the status of a loan as if a borrower were not in bankruptcy and the accounting of the loan was in accord with the relevant note and mortgage.

When a borrower files for bankruptcy relief, Rushmore also performs a second type of accounting using the MSP's "Bankruptcy Workstation" to supplement the accounting of a borrower's loan, including the status of the prepetition arrearage, during the bankruptcy case. Upon receiving notice of a borrower's bankruptcy filing, Rushmore activates the Bankruptcy Workstation and populates it with general details about the bankruptcy such as the case number, the chapter number, and the filer's name.  When a borrower files for relief under chapter 13, Rushmore calculates the prepetition arrearage for the proof of claim and inputs that figure into the Bankruptcy Workstation.

Additionally, Rushmore supplements the Bankruptcy Workstation with a separate spreadsheet, the "Bankruptcy Ledger," which contains a summary of a loan's status during the travel of the chapter 13 case and tracks the application and designation of funds received from the borrower and the chapter 13 trustee, the payment due dates, and the outstanding balances as they relate to the borrower's chapter 13 plan.  As a result, Rushmore employs two accounting methods when a borrower files for chapter 13 relief: a contractual accounting and a bankruptcy accounting.[13]

---

[13] This dual accounting for residential mortgage loans in chapter 13 cases was nicely described by Judge Keith M. Lundin (ret.):

> Servicers have to keep two sets of books to have any hope of accurately accounting for a mortgage in a [c]hapter 13 case. Remember that mortgage debts provided for under § 1322(b)(5) are not discharged at the completion of payments under § 1328(a).21 Permanence of the binding effect of confirmation of a plan under § 1327(a)22 depends on the completion of payments. If the [c]hapter 13 case converts or dismisses before completion of payments, the effect of confirmation evaporates and the parties to a home mortgage

The MSP is also capable of generating various reports, including monthly mortgage statements, payoff statements, tax statements, customer account activity statements ("Account Activity Statements"), and escrow disclosure statements ("Escrow Statements") based on the contractual accounting of the loan pursuant to the terms of the operable note and mortgage. The information and amounts contained in these various statements comes from the data Rushmore inputs into the MSP.

The Account Activity Statements reflect loan activity and are generally for internal use by Rushmore unless requested by the borrower.[14] These statements show how Rushmore applies portions of the Monthly Mortgage Payments to amounts due on a loan for principal, interest, and escrow. In addition to tracking the escrow account balance, escrow credits, and escrow debits, they also reflect activity in an account designated as a "suspense account." When a borrower makes a partial payment or overpays a monthly mortgage payment, Rushmore deposits the partial or overpayment in the suspense account.[15] Once there are sufficient funds in the account to pay a complete Monthly Mortgage Payment, Rushmore may apply those funds to a Monthly

---

are thrown back to contract and state law accounting. In other words, during the [c]hapter 13 case, a mortgage servicer has to account for payments from a [c]hapter 13 debtor or trustee consistent with the plan and the Bankruptcy Code, but in the event of conversion or dismissal, all bets are off and the parties are returned to their contract and state law positions. Because conversion or dismissal can happen at almost any time during the three- to five-year life of a [c]hapter 13 case, a diligent servicer literally has to keep a set of bankruptcy books and a set of nonbankruptcy books for the life of the case. The accounting methodologies and imperatives are significantly different with respect to each of those sets of books.

Keith M. Lundin, Lundin On Chapter 13, § 131.3, at ¶ 22, LundinOnChapter13.com (last visited July 19, 2022) (footnotes omitted).

[14] During the trial, the court admitted into evidence several Account Activity Statements covering various time periods. See J.E. 25 (the "September 2017 Activity Statement"); J.E. 32 (the "October 2019 Activity Statement"); J.E. 33 (the "August 2021 Activity Statement"). These statements provide a running history of the Loan's activity up to the date Rushmore generated them from the MSP. For the purposes of this opinion, the relevant statements are identified by their date of generation.

[15] See Doc. No. 284 ("Trial Tr. Vol. 2") 134:14-25. See also J.E. 1, § 2.

Mortgage Payment.[16]  Rushmore also uses the suspense account to accumulate payments received from the chapter 13 trustee during a borrower's bankruptcy case.[17]  The Account Activity Statements also reflect the amount of mortgage interest received from a borrower and reported to the Internal Revenue Service.  Whether or not a borrower is in bankruptcy, the Account Activity Statement tracks payments received and disbursements made with respect to a loan.  If a borrower is in bankruptcy, the Bankruptcy Ledger documents payments received, and disbursements made with respect to a loan in accordance with the Bankruptcy Code.

The Escrow Statements produced by the MSP identify (i) "the appropriate target balances for the escrow items (e.g., taxes and insurance) to be paid" from the escrow account; (ii) "the borrower's monthly escrow payments for the upcoming [12]-month period;" and (iii) "whether any surpluses, shortages, and deficiencies exist."[18]  They are typically generated on an annual basis, report the projected escrow account activity for the coming year, and include an escrow account history.  The escrow account history shows the actual escrow account activity from the prior year compared to the projected account activity for the same period.  Under certain circumstances, such as the commencement of a chapter 13 case that seeks to cure a mortgage default, mortgage servicers conduct an escrow analysis known in the industry as a "short year" annual escrow account analysis.  In such instances, a new beginning date for the escrow account computation year is also established and it typically corresponds to the date the borrower's first postpetition mortgage payment is due under the borrower's chapter 13 plan.[19]  As a servicer,

---

[16] See J.E. 1, § 2.  See also Doc. No. 285 ("Trial Tr. Vol. 3") at 120:10 to 124: 1-25.

[17] See Doc. No. 287, ¶¶ 60-63.

[18] Plaintiff's Exhibit ("P.E.") 72 at 5.

[19] As explained in the expert witness report of Ms. Pope's expert, John Rao, Esq., an attorney at the National Consumer Law Center, "[t]he escrow account computation year is the twelve-month period that a servicer

Rushmore is required to conduct an annual escrow account analysis of its borrowers' loans based on the computation year anniversary date and send borrowers an Escrow Statement at least once per year, within 30 days of the end of the computation year.  See 12 C.F.R. §§ 1024.17(c)(3), 1024.17(i), and 2609(c)(2).  These regulations are designed to help borrowers deposit the correct amount of escrow funds into the escrow account, and to avoid instances of over or under contributing to the escrow account.

The MSP also generates monthly mortgage statements to inform borrowers of the status of their loan and monthly payment obligation.  Like the Account Activity Statements, the monthly mortgage statements report the contractual application of payments; how payments are applied pursuant to the terms of the note and mortgage.  Prior to 2018, the monthly mortgage statements that Rushmore produced for borrowers in bankruptcy reflected only the contractual accounting of a borrower's loan.  As a result, they indicated that a borrower was delinquent on the borrower's loan obligation regardless of whether the borrower was following their chapter 13 plan and current with postpetition monthly mortgage payments.  The statements often contained disclaimers indicating that they were for "informational purposes only" and were "not an attempt to collect a debt and [did] not constitute a notice of personal liability with respect to the debt." The disclaimers also instructed the borrower to contact Rushmore if the borrower did not wish to receive "informational statements" in the future or to "obtain the most up-to-date amount due information."  The statements further specified that the amounts listed "may or may not be the full amount necessary to bring the account current."

---

establishes for the account, which usually begins with the borrower's initial payment date under the loan agreement, and continuing each [12]-month period thereafter."  P.E. 72 at 6 (citing 12 C.F.R. § 1024.17(b)).

In 2018, the MSP was modified to generate monthly mortgage statements that included bankruptcy specific information regarding a borrower's postpetition payment obligations, the application of payments received from the chapter 13 trustee, and the status of a borrower's loan while in bankruptcy.  The updated monthly mortgage statements also contained bankruptcy disclaimers similar to those described above.

D. Ms. Pope's 2014 Bankruptcy

The Popes stopped making their Monthly Mortgage Payments in March of 2012.  By the time Ms. Pope commenced her chapter 13 case on July 9, 2014, the Popes had failed to make 29 consecutive Monthly Mortgage Payments.[20]  As a result of the bankruptcy filing, Rushmore stopped sending Ms. Pope monthly mortgage statements and conducted a short year analysis, which concluded that Ms. Pope's Monthly Mortgage Payment would be $1,401.33 ($908.66 in principal and interest and $492.67 in escrow funds) effective August 1, 2014 (the "2014 Short Year Analysis").[21]

The confusion over the proper application of Ms. Pope's postpetition Monthly Mortgage Payments began when she made her first postpetition payment in August of 2014.  Although she was only required to pay $1,401.33 pursuant to the 2014 Short Year Analysis, Ms. Pope paid $1,448.87, the monthly amount she was required to pay prior to filing for chapter 13 relief.[22] From that payment of $1,448.87, Rushmore should have applied $908.66 to principal and interest, $492.67 to the escrow account, and $47.54 to the suspense account ($1,448.87 - $908.66

---

[20] The Popes missed 11 Monthly Mortgage Payments of $1,389.16 ($908.66 in principal and interest and $480.50 in escrow funds) between March of 2012 and January 1, 2013, and 18 Monthly Mortgage Payments of $1,448.87 ($908.66 in principal and interest and $540.21 in escrow funds) from February 1, 2013, to July 1, 2014.  See J.E. 10.

[21] See J.E. 10.

[22] See J.E. 25.  The testimony appears to reflect that she did not receive the 2014 Short Year Analysis prior to making the August 2014 Monthly Mortgage Payment, which may explain why she continued to pay $1,448.87.

- $492.67 = $47.54).  Instead, Rushmore only applied $480.50 to escrow and diverted the remaining funds of $59.71 to the suspense account, which was $12.17 too much.  Rushmore then used the $480.50 postpetition payment to pay the unpaid prepetition escrow amounts from the March 2012 mortgage bill.[23]

After Ms. Pope's August 2014 payment was processed on August 11, 2014, and applied to the March 2012 payment date, Rushmore disbursed $617.00 from the escrow account on September 2, 2014.[24]  Rushmore did not make any further disbursements from the escrow account until March of 2015.

In August of 2014, Ms. Pope filed an amended chapter 13 plan, which the court confirmed as orally modified by Ms. Pope's attorney during the confirmation hearing (the "Plan").[25]  The Plan, as incorporated by the court's order confirming it (the "Confirmation Order"),[26] required:

> (1) Ms. Pope to cure U.S. Bank's prepetition arrearage over five years by making plan payments in the amount of $850 to the chapter 13 trustee, commencing on August 9, 2014;[27]
>
> (2) Ms. Pope to make direct postpetition Monthly Mortgage Payments to U.S. Bank/Rushmore; [28]

---

[23] See J.E. 25 at 22; J.E. 41; Trial Tr. Vol. 2 at 219:22-221:6; Trial Tr. Vol. 3 at 52:16-23, 53:1-5.

[24] Although the September 2017 Activity Statement indicated that the amount was disbursed for hazard insurance, the $617.00 was actually used to repay the August 11 escrow advance.  See J.E. 11; J.E. 25 at 22; Trial Tr. Vol. 3 at 39:10-24; 40:1-24; 54:6-24.

[25] See J.E. 7.

[26] See J.E. 8.

[27] The Plan and Confirmation Order list U.S. Bank's secured arrearage claim as $42,500 subject to U.S. Bank filing a proof of claim, which it eventually did in October of 2014.  While the parties disputed the proper claim amount and treatment, they eventually resolved their differences.

[28] See J.E. 7; J.E. 8.

(3) U.S. Bank and Rushmore to apply and credit the Popes' postpetition Monthly Mortgage Payments to the Pope's "mortgage account as if the account were current and no prepetition default existed on the petition date" and "in the order of priority specified in the [Loan] and applicable non-bankruptcy law[;]" and

(4) Rushmore, as the servicer of the Loan, to provide informational statements to Ms. Pope.  Specifically, it required Rushmore, upon the written request of either Ms. Pope or her attorney, to provide Ms. Pope with "all information" regarding the status of the Loan "as it would provide absent a bankruptcy proceeding, including but not limited to: (a) coupon book or monthly statements to help the debtor properly make monthly payments, (b) addresses to which to send payments and to direct inquires, (c) balance and payoff information if requested, and (d) if applicable, escrow analyses, notices of rate adjustments and the like."[29]

The Plan also warned that "**[i]f a creditor applies payments in a manner not consistent with the terms of this plan, or applied Trustee payments to post-petition costs and fees without prior approval of this Court, such actions may be a violation of 11 U.S.C. § 524(i).**" (**Bold** in the original).

From September of 2014 through December of 2014, Ms. Pope made four Monthly Mortgage Payments to Rushmore in the amount of $1,448.87.[30]  Like the August 2014 payment, these payments exceeded the required payment amount listed on the 2014 Short Year Analysis. Between August 2014 and December 2014, Rushmore received and applied Ms. Pope's Monthly Mortgage Payments to prepetition payments due between March of 2012 and July of 2012 as follows:

---

[29] See J.E. 8, §11, ¶ F, 1.

[30] See J.E. 25 at 21-22.

| Date | Monthly Mortgage Payment made by Ms. Pope | Amount applied to Escrow by Rushmore | Date of Escrow Bill to which Rushmore applied payment | Amount applied to Suspense by Rushmore | Amount applied to Interest by Rushmore | Amount of Interest that was actually due |
|---|---|---|---|---|---|---|
| August 2014 | $1,448.87 | $480.50 | March 2012 | $59.71 | $549.74 | $512.67 |
| September 2014 | $1,448.87 | $480.50 | April 2012 | $59.71 | $548.53 | $511.32 |
| October 2014 | $1,448.87 | $480.50 | May 2012 | $59.71 | $547.30 | $509.97 |
| November 2014 | $1,448.87 | $480.50 | June 2012 | $59.71 | $546.08 | $508.62 |
| December 2014 | $1,448.87 | $480.50 | July 2012 | $59.71 | $544.84 | $507.26 |
| Total | | | | | **$2,736.39** | **$2,549.84** |

As it did with the August 2014 payment, Rushmore applied the next four Monthly Mortgage Payments differently than required by the Mortgage and Plan.  First, Rushmore applied $480.50 to prepetition escrow charges, diverting $59.71 to the suspense account each month instead of $47.54.  As before, the $59.71 that Rushmore placed in suspense included the $12.17 difference between the $492.67 escrow payment required by the 2014 Short Year Analysis and the $480.50 that Rushmore actually applied to escrow.  This five-month long misapplication of the Monthly Mortgage Payments resulted in underpayments to the escrow account, overpayments to the suspense account and the collection of interest that was not actually owed.[31]

In 2015, Rushmore issued a 2014 Tax Form 1098 which reported to the Internal Revenue Service ("IRS") that it received $2,736.39 in mortgage interest payments from Ms. Pope in 2014. [32]  This amount matched the amounts of interest recorded in the September 2017 Activity

---

[31] See J.E. 25; Trial Tr. Vol. 3 at 15:1-21; 16:1-24; 52:16-23; 53:2-24; 54:1-24.

[32] See P.E. 87.

Statement, which in turn reflected the contractual accounting of the Loan.[33]  This was incorrect as Rushmore was only entitled to collect $2,549.84 in interest for that period.[34]  Thus, Ms. Pope paid Rushmore $186.55 more in interest during this five-month period than she would have paid if Rushmore had applied her Monthly Mortgage Payments in accordance with the Plan.

On January 30, 2015, Ms. Pope objected to U.S. Bank's claim, challenging the escrow amounts and various charges to her account.[35]  Around the same time, Ms. Pope became increasingly concerned that she was not receiving monthly mortgage statements as required by the Plan.  In February and March of 2015, Ms. Pope's attorney wrote to Rushmore requesting that it resume mailing Ms. Pope monthly mortgage statements relating to the Loan.[36]  Also, in the February 2015 letter, Ms. Pope's attorney specifically requested that Rushmore provide him with the current Monthly Mortgage Payment amount if it had changed from the amount shown on the prepetition mortgage statements.[37]

Rushmore resumed sending Ms. Pope monthly mortgage statements in March of 2015. The March 2015 monthly mortgage statement reflected a past due amount of $44,657.14, which included charges for corporate advances and property preservation fees.[38]  Although the statement listed Ms. Pope's Monthly Mortgage Payment at $1,401.33, which was the correct amount per the 2014 Short Year Analysis, it indicated that Ms. Pope was 892 days delinquent on

---

[33] See J.E. 25.

[34] See J.E. 25, 32, 33.

[35] See In re Davin LW Pope, Bk. No. 14-11393-BAH, Doc. No. 24.

[36] See J.E. 16 (February 6, 2015 letter); J.E. 24 (March 9, 2015 letter).

[37] See J.E. 16.

[38] See P.E. 10.

payments due under the Loan.  It also included a disclaimer stating that the statement was for "informational purposes only for borrowers in bankruptcy."

From March of 2015 through February of 2016, although Ms. Pope received monthly mortgage statements reflecting various charges and fees which she believed to be inaccurate, she continued to make Monthly Mortgage Payments as required by the Plan.

Eventually, Ms. Pope and U.S. Bank reached an agreement resolving Ms. Pope's objection to U.S. Bank's Claim, which the court approved on October 6, 2015.[39]  The agreement required U.S. Bank to file an amended proof of claim reflecting a prepetition arrearage of $44,597.31 by November 5, 2015.

In late January of 2016, Ms. Pope's attorney once again disputed Rushmore's accounting of the Loan and requested a full accounting, including Monthly Mortgage Payments, fees, costs, and penalties charged to Ms. Pope.[40]  He also noted that U.S. Bank and Rushmore failed to file the amended proof of claim, which was due months earlier.

On February 5, 2016, three months after the November 5, 2015 deadline, Rushmore filed an amended proof of claim (Claim No. 2-2) (the "Amended Claim") listing the agreed upon prepetition arrearage of $44,597.31, which was comprised of: (i) 11 Monthly Mortgage Payments of $1,389.16 from March 1, 2012, to January 1, 2013, totaling $15,280.76, (ii) 18 Monthly Mortgage Payments of $1,448.87 from February 1, 2013 to July 1, 2014, totaling $26,079.66, and (iii) prepetition fees of $3,236.89.[41]

---

[39] See In re Davin LW Pope, Bk. No. 14-11393-BAH, Doc. Nos. 67 and 68.

[40] See P.E. 69.

[41] See J.E. 10. The court notes that the Amended Claim lists payments being due from January 1, 2012, through January 1, 2013, instead of March 1, 2012, though January 1, 2013.  Nevertheless, the parties stipulated to the

Although the Amended Claim was filed in February of 2016, Rushmore did not respond to Ms. Pope's attorney until March 11, 2016, when it indicated that it filed the Amended Claim on February 5, 2016.[42]  In addition, Rushmore attached an Escrow Statement and a payoff statement, which were both dated February 8, 2016, to the response letter.[43]  Although 12 C.F.R. § 1024.17(c)(3) required Rushmore to conduct an annual escrow analysis before July 31, 2015, the expiration of the computation year, it failed to do so for an additional 19 months.  The February 2016 Escrow Statement listed a total Monthly Mortgage Payment of $1,431.95, which included a payment of $908.66 for principal and interest and an increased escrow payment of $523.29, effective April 1, 2016.  The new escrow payment included an increase of $54.87 to account for the projected escrow shortage of $658.42.  The February 2016 Payoff Statement indicated that the Loan was due for the April 1, 2014, Monthly Mortgage Payment.  Rushmore's letter also explained that it was "in the process of re-classifying assessed property inspections fees as non-recoverable charges" and that "[a]ny future inspections assessed with [Ms. Pope] is post current [sic] will also be re-classed to [Ms. Pope] [as] non-recoverable."

On March 11, 2016, U.S. Bank filed its first Notice of Mortgage Payment Change pursuant to Federal Rule of Bankruptcy Procedure 3002.1, which notified Ms. Pope that her Monthly Mortgage Payment was increasing due to an increase in her monthly escrow payment.[44] From March of 2016 through June of 2019, U.S. Bank filed five Notices of Mortgage Payment

---

prepetition arrearage amount and correlating payments.  Thus, the court will disregard the discrepancy for purposes of this opinion.

[42] See P.E. 70.

[43] See J.E. 17 ("February 2016 Payoff Statement"); J.E. 18 ("February 2016 Escrow Statement").

[44] See J.E. 11 (the "First Notice").

Change to notify Ms. Pope of changes to her Monthly Mortgage Payment and the effective dates of those changes.[45]  The Notices provided the following information:

| Description | Filing Date | Effective Date | New Monthly Payment | New Principal and Interest | New Escrow Total[46] | Escrow - Required Escrow | Escrow - Shortage/ Surplus Spread |
|---|---|---|---|---|---|---|---|
| First Notice | March 11, 2016 | April 1, 2016 | $1,431.95 | $908.66 | $532.29 | $468.42 | $54.87 |
| Second Notice | August 5, 2016 | November 1, 2016 | $1,435.59 | $912.30[47] | $532.29 | -- | -- |
| Third Notice | February 1, 2017 | April 1, 2017 | $1,571.29 | $912.30 | $658.99 | $525.95 | $133.04 |
| Fourth Notice | August 31, 2018 | April 1, 2017 | $1,567.65 [48] | $912.30 | $658.99 | $525.95 | $133.04 |
| Fifth Notice | June 10, 2019 | July 1, 2019 | $1,558.08 | $908.66[49] | $649.42 | $580.46 | $68.96 |

Between the filing of the Third Notice and the Fourth Notice, Ms. Pope received an annual Escrow Statement dated January 26, 2018 (the "January 2018 Escrow Statement").  The January 2018 Escrow Statement increased Ms. Pope's Monthly Mortgage Payment to $1,812.11

---

[45] See J.E. 11; J.E. 12 (the "Second Notice"); J.E. 13 (the "Third Notice"); J.E. 14 (the "Fourth Notice"); J.E. 15 (the "Fifth Notice") (collectively, the "Notices").

[46] The escrow amounts on the First, Third, Fourth and Fifth Notices are separated into two categories: "Required Escrow Payment" and "Shortage/ Surplus Spread."

[47] Increase of $3.64 as a result of erroneous interest rate increase from the fixed rate of the Loan of 4.075% to 4.125%.

[48] The court is aware of the $3.64 discrepancy between the amount that the Fourth Notice established as the monthly payment—$1,567.65– and the actual sum of the principal, interest and escrow payments for the period covered by the Fourth Notice, which is $1,571.29 ($912.30 + $658.99).  Although there is no evidence or testimony directly on point about this anomaly and though not material to the outcome of this case, the difference may be explained by the fact that the Fourth Notice was filed after the Second Notice had been withdrawn in order to address the Defendant's erroneous increase in the interest rate on the Pope's fixed rate loan.  In addition, the Fourth Notice though filed on August 18, 2018, purports to have an effective date of April 1, 2017.  During those 16 months, the Defendants had been charging, and the Popes paying, an additional $3.64 in interest.

[49] Decrease of $3.64 as a result of reduction of incorrect interest rate to 4.075%.

and decreased Ms. Pope's escrow payment to $615.00, but was never filed with the court as an attachment to a Notice of Mortgage Payment Change as required by Federal Rule of Bankruptcy Procedure 3002.1(c).  As a result, Ms. Pope filed a Motion to Preclude Use of Omitted Information Pursuant to Rule 3002.1(f) on August 2, 2018, asserting that the January 2018 Escrow Statement compounded the confusion already caused by Rushmore's failure to send monthly mortgage statements to her and seeking an order clarifying that she was only required to pay the amounts listed on the Notices filed with the court.[50]

On August 31, 2018, U.S. Bank withdrew the Second Notice and filed the Fourth Notice, which amended the Third Notice.  While the Fifth Notice decreased Ms. Pope's Monthly Mortgage Payment to $1,558.08 and her escrow payment to $649.42, effective July 1, 2019, the May 29, 2019 Escrow Statement, which was attached to it, did not show the actual application of the escrow payments preceding May of 2019.  Rather, the account history section, which should have shown the actual escrow activity for the preceding year, only indicated the application of a $653.48 escrow payment to the escrow account between May and June of 2019.

Despite Rushmore's failure to timely conduct an escrow analysis before the computation year anniversary date, ongoing discrepancies in the monthly mortgage statements, and inconsistencies in the Notices, Ms. Pope continued to make all of her Monthly Mortgage Payments in accordance with the Plan and the applicable Notices.

Ms. Pope's frustrations with the administration of the Loan continued, and in June of 2016, she filed a complaint with the Consumer Finance Protection Bureau (the "CFPB"), asserting that Rushmore improperly charged her for property preservation, corporate advances,

---

[50] See In re Davin LW Pope, Bk. No. 14-11393-BAH, Doc. No. 82.

and attorney's fees as documented by the monthly mortgage statements.[51]  Rushmore responded

to the complaint by waiving $57.50 in property inspection charges.  It also unilaterally decided to

stop sending Ms. Pope monthly mortgage statements for the second time, in contravention of the

Plan.  According to Darla Martin's testimony, Rushmore did this because it determined that Ms.

Pope filed the CFPB complaint because she was confused by the monthly mortgage statements.[52]

Also in July of 2016, Rushmore erroneously notified Ms. Pope that her monthly principal

and interest payments were increasing by $3.64 due to the Loan's interest rate increasing to

4.125%, notwithstanding that the Loan was a fixed rate loan.[53]

On December 8, 2016, Rushmore sent Ms. Pope a payoff statement.[54]  As with the

February 2016 Payoff Statement, this statement indicated that the Loan was contractually due for

a prepetition payment.  Specifically, it stated that the Loan was due for the August 1, 2015

Monthly Mortgage Payment.  This statement reflected $5,378 in "Recoverable Corporate

Advances" being charged to the account, which Ms. Pope believed to exceed the amount she

actually owed.

On June 16, 2017, Ms. Pope's attorney served U.S. Bank's attorney with a Motion for

Rule 9011 Sanctions, asserting that U.S. Bank improperly increased Ms. Pope's Monthly

Mortgage Payments and misapplied escrow payments to the suspense account.[55]  On August 8,

2017, Ms. Pope's attorney requested that Rushmore provide specific information relating to the

---

[51] See J.E. 19.

[52] See Trial Tr. Vol. 2 at 204:1-16.

[53] See Defendants' Exhibit ("D.E.") 203.

[54] See J.E. 21.

[55] See P.E. 71.

Loan during the period between July 9, 2014, through August 8, 2017.[56]  He also requested, for the third time, that Rushmore resume mailing monthly mortgage statements to Ms. Pope. Rushmore responded in late September of 2017 providing Ms. Pope's attorney with the September 2017 Activity Statement.[57]  According to Rushmore, the September 2017 Activity Statement reflected "how [Rushmore] applied payments to the [L]oan" and "running balances of the unpaid principal and escrow account."

On May 9, 2019, Rushmore took $1,562.14 from the Popes' suspense account and applied it to the May 2019 Monthly Mortgage Payment due date.[58]  Ms. Pope made a payment on May 16, 2019, in the amount of $1,567.65 pursuant to the Fourth Notice, which was applied to the June 2019 Monthly Mortgage Payment due date.  As a result, Rushmore began applying the Monthly Mortgage Payments it received for a particular month to the next monthly due date. For example, instead of applying Ms. Pope's June 18, 2019, Monthly Mortgage Payment to the June 2019 due date, Rushmore applied the payment to the July 2019 due date. [59]  Ms. Pope's Monthly Mortgage Payments continued to be applied to the next monthly due date throughout the remainder of the plan term.

From April 1, 2017, through June 1, 2019, Ms. Pope paid her Monthly Mortgage Payment in the amounts listed in the Notices, which included $658.99 for escrow.  During this 27-month period, Rushmore should have applied a total of $17,792.73 ($658.99 x 27) to the escrow account pursuant to the applicable Notices.  Instead, it only applied a total of $15,418.93

---

[56] See J.E. 24.

[57] See J.E. 25.

[58] See J.E. 32 at 6.

[59] Ms. Pope often made her Monthly Mortgage Payments after the due date and during the grace period.  Despite this, Rushmore treated Ms. Pope's Monthly Mortgage Payments as timely and did not charge Ms. Pope late fees.

to escrow, improperly diverting $2,373.80 ($17,792.73 - $15,418.93) of Ms. Pope's escrow payments to the suspense account.  The suspense account also held funds received from the chapter 13 trustee, which were applied to Ms. Pope's prepetition arrearage.

In mid-June of 2021, Ms. Pope made a Monthly Mortgage Payment in the amount required on the applicable Notice.  However, Rushmore rejected this payment, and instead took $1,519.07 from the Popes' suspense account and applied it to the June 2021 Monthly Mortgage Payment due date.[60]  Because Rushmore was applying Ms. Pope's Monthly Mortgage Payments to the next month's due date, Ms. Pope would have been two months ahead if Rushmore accepted Ms. Pope's June 2021 Monthly Mortgage Payment.

Rushmore under-collected escrow by diverting funds to the suspense account, which created an escrow shortage. Accordingly, the funds that accumulated in the suspense account included both diverted escrow payment amounts and the chapter 13 trustee's plan payments. Due to the escrow shortage, Rushmore increased Ms. Pope's monthly escrow payment and collected excess funds in the suspense account.  To the extent the excess funds were not escrow funds, they could be used to make a full Monthly Mortgage Payment.  As previously explained, that was not the case here.

On August 23, 2019, the chapter 13 trustee filed a Notice of Final Cure Payment pursuant to Federal Rule of Bankruptcy Procedure 3002.1(f), stating that Ms. Pope had cured the $44,597 prepetition arrearage.  On September 11, 2019, U.S. Bank filed a Response to Notice of Final Cure Payment, indicating that Ms. Pope was current with her postpetition obligations and agreeing that she had cured the prepetition arrearage.

---

[60] See Trial Tr. Vol. 2 at 132:1-25, 134:1-15; J.E. 33 at 1.

E. <u>The Trial</u>

The trial commenced on October 12, 2021 and concluded on October 14, 2021.  Ms.

Pope testified in support of her claims and offered the expert witness testimony of attorney John

Rao.  U.S. Bank, and Rushmore offered the testimony of Darla Martin, a legal proceeding

specialist for Rushmore, and Michael Ruiz, Assistant Vice President of Default Operations for

Rushmore.  Notably, during the cross-examination of Ms. Pope, she refused to answer questions

regarding any prior mental or physical disabilities, work history, or other conditions that

prevented her from working or interfered with her daily life, subjects which were explored in her

direct testimony in support of her emotional distress claim.  Although the court warned Ms. Pope

that her refusal to answer questions jeopardized her claims for emotional damages, she held fast

and refused to respond to the Defendants' relevant and non-objectionable inquires on this topic.

At the trial's conclusion, the court issued an order clarifying the parties' agreement that Count

IV(B) and Count VI were stricken from the Complaint and  denying all of Ms. Pope's claims for

damages relating to emotional distress due to her refusal to testify on cross-examination as to any

preexisting disability. [61]  On December 13, 2021, Ms. Pope filed her memorandum of law and

proposed findings of fact, which withdrew Count IV(A) of the Complaint thus leaving her claims

under Counts I, II, III, and V for the court's consideration.

**III.  DISCUSSION**

A. <u>Count I: Breach of Contract</u>

In Count I (Complaint, ¶¶ 54-66), Ms. Pope alleges that U.S. Bank breached the terms of

the Loan in two ways.  First, she asserts that U.S. Bank breached the terms of the Mortgage when

Rushmore, its agent, failed to deposit the full amount of her monthly escrow payments into the

---

[61] <u>See</u> Doc. No. 281.

escrow account.  According to Ms. Pope, U.S. Bank established the Monthly Mortgage Payment amount through the 2014 Short Year Analysis, the Amended Claim, and the Notices.  Those documents separate the total monthly payment into three payment amounts: interest, principal, and escrow.  Ms. Pope contends that although the Mortgage required U.S. Bank to deposit the applicable escrow payment into her escrow account, Rushmore diverted a portion of her monthly escrow payments made from April 1, 2017, through June 1, 2019, to the suspense account.  She further contends that Rushmore improperly applied the diverted escrow payments to principal and interest.  As a result, Ms. Pope seeks $2,373.80 in damages, which represents the net amount of escrow funds applied to the suspense account from the escrow payments.[62]

Second, Ms. Pope asserts that U.S. Bank breached the Mortgage when Rushmore increased the interest rate on the Loan from 4.075% to 4.125%.  As a result of the increase, Ms. Pope asserts that Rushmore collected an additional $80.08 in interest.[63]  In addition, Ms. Pope contends that she is entitled to attorney's fees pursuant to Sections 20 and 25 of the Mortgage as a result of these breaches.

The Defendants counter that U.S. Bank did not breach the terms of the Mortgage by diverting funds to the suspense account because those funds were ultimately used to pay interest, principal, and escrow in the order of priority outlined in the Mortgage.  Essentially, they maintain, "no harm, no foul."  The Defendants contend that they applied the postpetition payments in the order in which they became due as required by Section 2 of the Mortgage.  They

---

[62] It is unclear why Ms. Pope's post-trial brief did not seek damages based on Rushmore's apparent diversion of escrow funds to the suspense account from August of 2014 through June of 2015.  According to the Amended Claim, Ms. Pope's monthly escrow payment was supposed to be $492.67, but Rushmore only applied $480.50 to the escrow account.  See J.E. 10; J.E 41.

[63] While Count I of Ms. Pope's Complaint also claims that U.S. Bank erroneously charged her for fees, she abandoned that argument in her post-trial briefing.

further assert that Section 2 allowed them to place "excess funds" (i.e. the net escrow payment amounts diverted to the suspense account and the $80.08 in erroneously collected interest) in the suspense account.  The Defendants argue that this practice comports with Section 3 of the Mortgage, which governs the collection and application of escrow funds in an escrow account, because the diverted net escrow funds and interest were accounted for in the suspense account and eventually applied to periodic payments or interest for Ms. Pope's benefit.  In short, they assert that the application of the net escrow payments and interest to the suspense account, as opposed to the escrow account, was consistent with the Mortgage and, therefore, did not harm Ms. Pope.

They also assert that Ms. Pope's request for damages is barred because she failed to comply with the pre-suit notice requirements contained in Section 20 of the Mortgage.  In support, they state that Ms. Pope's Motion for Rule 9011 Sanctions and her attorney's letter dated August 8, 2017, did not provide them with notice of the erroneously increased interest rate, nor did Ms. Pope request the return of the $80.08 in interest that Rushmore placed in suspense.

Finally, U.S. Bank and Rushmore assert that Ms. Pope has failed to present any evidence of damages caused by Rushmore's alleged misapplication of postpetition escrow payments.  Rather, they suggest that Ms. Pope contributed to any loss of use of the $713.10 in diverted escrow funds by paying $1,448.87 per month instead of $1,401.33 between August 11, 2014, and October 14, 2015.[64]

### 1. Applicable Law

New Hampshire law governs Ms. Pope's breach of contract claim.  See Mortgage, § 16. "In New Hampshire, a plaintiff bringing a breach of contract claim must prove both the breach of

---

[64] See Trial Tr. Vol. 3 at 120-123; D.E. 216; Doc. No. 287, ¶ 66.

a contractual promise and the damage sustained from that breach." Moody v. PennyMac Loan

Servs., LLC, No. 16-CV-00021-JL, 2019 WL 7596261, at *6 (D.N.H. Nov. 12, 2019) (citing

Frangos v. Bank of America, No. 13-CV-472-PB, 2015 WL 6829104, at *2-3 (D.N.H. Nov. 6,

2015) (Barbadoro, J.), aff'd, 826 F.3d 594 (1st Cir. 2016)).  See also Audette v. Cummings, 165

N.H. 763, 767, 82 A.3d 1269 (2013) (stating that "[a] breach of contract occurs when there is a

failure without legal excuse to perform any promise which forms the whole or part of a

contract").  "If a breach is proved, the opposing party may recover damages as compensation for

any loss caused by the breach." Frangos, 2015 WL 6829104, at *2.  "'[T]he law does not require

absolute certainty for recovery of damages[.]'" Id. at *3 (quoting Petrie–Clemons v. Butterfield,

122 N.H. 120, 125, 441 A.2d 1167 (1982)).  Nevertheless, "'a claimed element of loss must be

computed in some rational way upon a firm factual base.'" Id. (quoting Reliance Steel Prod. Co.

v. Nat'l Fire Ins. Co. of Hartford, 880 F.2d 575, 578 (1st Cir. 1989)).  Where there has been a

breach of contract, "the purpose of awarding compensatory damages . . . is to place the plaintiff

in the position the plaintiff would have occupied absent a breach." Id. at *2.  See also Robert E.

Tardiff, Inc. v. Twin Oaks Realty Tr., 130 N.H. 673, 677, 546 A.2d 1062 (1988).  Ms. Pope

bears the burden of proving "the extent and amount of damages sustained as a result of the

breach." Id. at *3.  In New Hampshire, if a party alleging breach of contract has not suffered any

damages or fails to prove such damages at trial, it may still recover nominal damages. See Fitz

v. Coutinho, 136 N.H. 721, 728, 622 A.2d 1220, 1225 (1993); Pugliese v. Town of Northwood

Planning Bd., 119 N.H. 743, 751-52, 408 A.2d 113, 118-19 (1979); Blodgett v. Stone, 60 N.H.

167, 167 (1880).  See also Restatement (Second) of Contracts §§ 328, 346 (Am. Law Inst. 1981).

   2.  Analysis

   U.S. Bank breached the Mortgage by failing to apply the full amount of the required

escrow payments to Ms. Pope's escrow account.  The testimony and exhibits admitted during

trial establish that Ms. Pope continually made her Monthly Mortgage Payments in the amounts

listed in the Amended Proof Claim and the applicable Notices.  Section 2 of the Mortgage

requires Ms. Pope to make Monthly Mortgage Payments that consists of (a) interest, (b)

principal, and (c) escrow.  Section 3 of the Mortgage requires Ms. Pope to make escrow

payments to cover specific expenses defined as "Escrow Items."  As noted above, Section 3

defines "Escrow Items" as:

> (a) taxes and assessments and other items which can attain priority
> over this Security Instrument as a lien or encumbrance on the
> Property; (b) leasehold payments or ground rents on the Property, if
> any; (c) premiums for any and all insurance required by Lender
> under Section 5; and (d) Mortgage Insurance premiums, if any, or
> any sums payable by Borrower to Lender in lieu of the payment of
> Mortgage Insurance premiums in accordance with the provisions of
> Section 10.

The Mortgage does not include principal and interest in the definition of "Escrow Items.".

Although U.S. Bank and Rushmore suggest that Section 3 of the Mortgage permits Rushmore to

collect and hold escrow funds in any "account" (i.e., including the suspense account),[65] the court

is not convinced.  The court concludes that, based on the testimony of Darla Martin and Michael

Ruiz, the escrow account and the suspense account are distinct accounts; they are not

interchangeable, and Rushmore cannot account for Ms. Pope's escrow payments through the

suspense account.[66]

The evidence also establishes that U.S. Bank and Rushmore diverted a portion of Ms.

Pope's postpetition escrow payments from the escrow account to the suspense account from

---

[65] See Doc. No. 287, ¶ 59 (stating that "[t]he Mortgage also authorizes the Lender to collect and hold sufficient funds in an "account" to apply escrow funds as specified by RESPA.")

[66] See Testimony of Darla Martin (Trial Tr. Vol. 2 at 134:14-25); Testimony of Michael Ruiz (Trial Tr. Vol. 3 at 9:15-24, 10:1-13, 142:7-23).

August of 2014 through December of 2014,[67] and from April 1, 2017, through June 1, 2019.[68]
Eventually, Rushmore applied the diverted escrow funds towards two Monthly Mortgage
Payments on May 9, 2019[69] and June 29, 2021.[70]  Thus, U.S. Bank and Rushmore applied Ms.
Pope's escrow payments to non-Escrow Items, in violation of Section 5 of the Mortgage.[71]

      3.  <u>Damages</u>

      Ms. Pope seeks two types of damages in Count I: compensatory damages and attorney's
fees.  As for the first, even though Ms. Pope met her burden of establishing that U.S. Bank
breached the Mortgage by improperly diverting escrow payments, she failed to offer any
testimony supporting any damages for which she has not been compensated.  Although Ms. Pope
demonstrated that Rushmore misapplied a total of $2,373.80 in escrow funds over a 27-month
period, the chapter 13 trustee's Notice of Final Cure Payment and U.S. Bank's Response thereto
confirm that the misapplied escrow funds were eventually accounted for and applied to her Loan
obligations.  Without an additional showing of loss of value or use of funds, this court is unable
to determine an amount "necessary to place [Ms. Pope] in the position [she] would have
occupied absent a breach."  <u>Frangos</u>, 2015 WL 6829104, at *2.  However, she is entitled to

---

[67] <u>See</u> J.E. 25 at 21-23; <u>see also</u> Trial Tr. Vol. 3 at 52:8-23, 53:2.

[68] <u>See</u> J.E. 13-15; Doc. No. 283 ("Trial Tr. Vol. 1") at 122:20, 123:5; J.E. 32 at 5-24 (reflecting process date and payment amount); J.E. 41.

[69] <u>See</u> Trial Tr. Vol. 3 at 142:19-144:4; J.E. 32 at 6.

[70] <u>See</u> J.E. 66; Trial Tr. Vol. 2 at 134:2-22.

[71] Ms. Pope also successfully introduced evidence establishing a second breach— the collection of an additional $3.64 a month in interest over a 22-month period from November of 2015 through August of 2018 as a result of the Defendants' improper increase of the fixed interest rate.  However, as the Defendants correctly note, she failed to comply with Section 20 of the Mortgage, which required her to give the Defendants notice of the breach and an opportunity to take corrective action.  Thus, this aspect of Count I fails

nominal damages under New Hampshire law and the court hereby awards her $1.00 of damages under Count I.

As for Ms. Pope's request for attorney's fees under Section 25 of the Mortgage, New Hampshire law applies.  See Wells Fargo Bank, Natl. Assn. as Tr. for Option One Mortg. Loan Tr. 2007-2, Asset-Backed Certificates, Series 2007-2 v. Moskoff, 1:17-CV-136-JL, 2021 WL 4798102, at *1 (D.N.H. Oct. 14, 2021).  Section 25 of the Mortgage provides for the award of reasonable attorney's fees if Ms. Pope prevails in this action pursuant to N.H. Rev. Stat. Ann. § 361-C:2.[72]  See N.H. Rev. Stat. Ann. § 361-C:2 (stating that "[r]easonable attorney's fees shall be awarded to the buyer, borrower or debtor if he prevails in (a) Any action, suit or proceeding brought by the retail seller, lender or creditor; or (b) An action brought by the buyer, borrower or debtor").  See also In re Taal, 540 B.R. 24, 38 (Bankr. D.N.H. 2015) (interpreting section 25 of the debtor's mortgage as mandating the award of reasonable attorney's fees under N.H. Rev. Stat. Ann. § 361-C:2 where a debtor prevails against a mortgagee in a bankruptcy proceeding)).

Given that Ms. Pope stated her intention to seek a determination of reasonable and necessary attorney's fees to be awarded after the court's finding of liability,[73] an approach which the Defendants did not object to nor did the court preclude, the court shall issue a scheduling order setting a deadline for Ms. Pope to file and serve on U.S. Bank and Rushmore a motion requesting an award of attorney's fees.

---

[72] See J.E. 1, § 25.

[73] See Doc. No. 264 at 2223 (indicating intention to file a post-trial motion with billing records and other information necessary for the court to determine an appropriate fee award); Doc. No. 288 at 3 (noting that the Defendants did not object to Ms. Pope's proposed post-trial motion for damages).  See also Fed. R. Bankr. P. 7054(b)(2)(A).

B. <u>Count II: Violation of the Automatic Stay</u>

In Count II (Complaint, ¶¶ 67-81), Ms. Pope asserts that U.S. Bank and Rushmore willfully violated the automatic stay under § 362(a) by applying postpetition Monthly Mortgage Payments to Ms. Pope's prepetition mortgage arrearage, entitling her to actual damages pursuant to § 362(k)(1).  In support, Ms. Pope points to the Account Activity Statements, tax statements, and Escrow Statements, which show a corresponding contractual accounting of Ms. Pope's Loan.  Ms. Pope contends that the statements reflect U.S. Bank and Rushmore's misapplication of diverted postpetition escrow funds to prepetition obligations.  Conversely, U.S. Bank and Rushmore maintain that the Bankruptcy Ledger shows the actual application of Ms. Pope's Monthly Mortgage Payments in compliance with the Plan.  They further state that Rushmore's use of a contractual accounting system and the Bankruptcy Ledger is in line with industry standard.  U.S. Bank and Rushmore also assert that Ms. Pope failed to meet her burden of proof as to her entitlement to damages of any kind.

1. <u>Applicable Law</u>

Section 362(a) provides a nonexclusive list of actions and collection activities that are stayed by the filing of a voluntary or involuntary petition.  <u>See</u> 11 U.S.C. § 362(a).  Subsection (a)(6) stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the cases under [the Bankruptcy Code.]" 11 U.S.C. § 362(a)(6).

"'A debtor seeking damages under [§ 362(k)(1)] bears the burden of proving by a preponderance of the evidence . . . three elements: (1) that a violation of the automatic stay occurred; (2) that the violation was willfully committed; and (3) that the debtor suffered damages as a result of the violation.'"  <u>Perez v. Deutsche Bank Nat'l Trust Co. (In re Perez)</u>, 556 B.R. 527, 530 (B.A.P. 1st Cir. 2016) (quoting <u>Slabicki v. Gleason (In re Slabicki)</u>, 466 B.R. 572, 577-78 (B.A.P. 1st Cir. 2012) (citation omitted)).  "'A willful violation does not require a specific intent'

and is established 'if there is knowledge of the stay and the defendant intended the actions which constituted the violation.'" In re Franklin, 2017 BNH 011, 14-15 (quoting Fleet Mortg. Grp., Inc. v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999)).

"A creditor's misapplication of postpetition mortgage payments can result in a stay violation. Indeed, the [c]ourt has previously held that '[a]pplication of postpetition payments to prepetition obligations of a chapter 13 debtor is simply a collection of a prepetition debt outside of a plan of reorganization prohibited by § 362(a)(6) of the Bankruptcy Code.'" In re Franklin, 2017 BNH 011, 15 (quoting Gaff v. Town of Pembroke (In re Doolan), 447 B.R. 51, 65 (Bankr. D.N.H. 2011) (finding the town violated the stay where it admittedly applied postpetition real estate tax payments to prepetition tax liabilities). The stay is further violated when a lender's "misapplication of [postpetition] payments results in improper fees and charges to the debtor's account." Id. (citing McCormack v. Fed. Home Loan Mortg. Corp. (In re McCormack), 203 B.R. 521, 525-26 (Bankr. D.N.H. 1996)). Internal bookkeeping errors, absent some overt collection activity, do not amount to a violation of the automatic stay. See id. (citing Mann v. Chase Manhattan Mortg. Corp., 316 F.3d 1, 3 (1st Cir. 2003)).

    2.   Analysis

        i.   *Rushmore*

Rushmore violated the automatic stay by applying Ms. Pope's postpetition Monthly Mortgage Payments pursuant to the contractual terms of the Loan. Although the Defendants insist that the Bankruptcy Ledger reflects the actual application of funds pursuant to the Plan's terms, the Account Activity Statements, tax statements, and Escrow Statements demonstrate that Rushmore applied various postpetition escrow payments to prepetition obligations. The testimony presented at trial established a distinction between the tracking and application of payments made by Ms. Pope. The Account Activity Statements also showed Rushmore's actual

application of the Monthly Mortgage Payments.  For example, the September 2017 Activity Statement showed that Rushmore applied Ms. Pope's August 2014 Monthly Mortgage Payment to the March of 2012 payment due date.[74]

Rushmore's misapplication of postpetition funds to prepetition obligations is also supported by Rushmore's 2014 Tax Form 1098 and the September 2017 Activity Statement. The 2014 Tax Form 1098 reports that Rushmore received $2,736.39 in mortgage interest payments from Ms. Pope in 2014.  Moreover, the September 2017 Activity Statement, which Rushmore admits shows the contractual application of payments, also shows that Rushmore applied $2,736.39 of Ms. Pope's Monthly Mortgage Payments to interest due on the Note.  Thus, the amount of interest reported to the IRS was based on the contractual accounting of the Loan. If Rushmore had been applying Ms. Pope's postpetition Monthly Mortgage Payments to postpetition obligations only, the IRS would have reported a total interest of $2,549.84, which is the total amount of postpetition interest that was actually due between August of 2014 to December of 2014.

ii.    _U.S. Bank_

U.S. Bank is liable for Rushmore's violation of the automatic stay due to its agency relationship with Rushmore.  See Todt v. Ocwen Loan Serv., LLC (In re Todt), 567 B.R. 667, 683-84 (Bankr. D.N.H. 2017).  As the principal, U.S. Bank is liable for Rushmore's wrongful acts within the scope of its relationship.  See id. at 677 n.4.  Accordingly, Rushmore's violations of the automatic stay impute to U.S. Bank.

---

[74] See J.E. 25 at 22.

3.    <u>Damages</u>

"A creditor willfully violating the automatic stay is liable for actual damages and, in appropriate circumstances, punitive damages." <u>Foster v. Burns (In re Foster)</u>, 574 B.R. 19, 24-25 (Bankr. D. Me. 2017) (citing 11 U.S.C. § 362(k)(1)). <u>See also</u> <u>In re Franklin</u>, BNH 011, 14 (discussing mandatory awards upon finding of a willful violation of the automatic stay). "Courts within the First Circuit have concluded that the words 'shall recover' indicate that 'Congress intended that the award of actual damages, costs and attorney's fees be **mandatory** upon a finding of a willful violation of the stay.'" <u>Duby v. United States (In re Duby)</u>, 451 B.R. 664, 670 (B.A.P. 1st Cir. 2011), <u>aff'd</u>, No. 11-9006, 2012 WL 12552111 (1st Cir. Apr. 17, 2012) (quoting <u>Vázquez Laboy v. Doral Mortg. Corp. (In re Vázquez Laboy)</u>, 416 B.R. 325, 332 (1st Cir. BAP 2009) (emphasis in original), <u>rev'd in part and vacated in part on other grounds,</u> 647 F.3d 367, 375-76 (1st Cir. May 27, 2011). <u>See</u> <u>also</u> <u>In re Franklin</u>, 2017 BNH 011, 19 (ordering the debtor's attorney to file an affidavit itemizing the fees incurred in the matter where the mortgagee's violation of the automatic stay mandated an award for actual damages, including attorney's fees). Importantly, a debtor need not establish that she has incurred damages apart from attorney's fees to be awarded such fees under § 362(k)(1). <u>See</u> <u>In re Duby</u>, 451 B.R. at 674.

The court has the discretion to award punitive damages in appropriate cases if the award comports with due process and may award punitive damages to deter future misconduct. <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 416 (2003). Because U.S. Bank and Rushmore violated the automatic stay, this court is required to award actual damages to Ms. Pope, including costs and attorney's fees. Nevertheless, Ms. Pope is still required to first prove her damages. <u>See</u> <u>Defeo v. Winyah Surgical Specialists, P.A. (In re Defeo)</u>, 635 B.R. 253, 265 (Bankr. D.S.C. 2022). Indeed, "'[a]n award of damages under [§] 362(k) must be founded on

concrete, non-speculative evidence and cannot be based merely on speculation, guess or conjecture.'" Id. (quoting In re Banks, 612 B.R. 167, 172 (Bankr. D.S.C. 2020)).

"Courts traditionally view 'actual damages' as a broad umbrella term, including, but not limited to, lost time damages, out-of-pocket expenses and emotional damages." Id. At 267 (quoting Ojiegbe v. Walter (In re Ojiegbe), 539 B.R. 474, 479 (Bankr. D. Md. 2015)).  While "[d]amages for emotional distress are recoverable as actual damages in a § 362(k) action[,]" this court has already ruled that Ms. Pope is not entitled to such damages due to her failure to testify during cross-examination about her prior and/or current history of mental health conditions or disabilities.  Id. At 265.  As for damages relating to out-of-pocket expenses or costs, Ms. Pope acknowledged that she had not incurred any expenses or expert witness fees.[75]  Although she testified that she had spent at least one hour a day for the past seven years working on this case in support of damages for lost time, she did not produce credible evidence supporting that assertion or the value of the alleged lost time.[76]  Thus, these alleged damages are not recoverable.

This leaves this issue of whether Ms. Pope is entitled to attorney's fees.  Given that § 362(k)(1) mandates an award of attorney's fees under the present circumstances, and Ms. Pope's unobjected to pretrial request that the court reserve its determination of the amount of attorney's fees to be awarded until after trial, the court will address the amount of reasonable and necessary attorney's fees arising from U.S. Bank and Rushmore's violation of the automatic stay in the same manner as Ms. Pope's entitlement to attorney's fees under Count I.[77]

---

[75] See Trial Tr. Vol 1 at 174:1-25, 175:1-25.

[76] Id.

[77] See D.E. 264 at 22-23.

C.  <u>Count III: Rushmore's Contempt of Court</u>

In Count III, Ms. Pope seeks to hold Rushmore in contempt of court under six different theories, which include: (A) Rushmore's alleged failure to deposit funds into the escrow account (Complaint, ¶¶ 82-89); (B) Rushmore's alleged application of postpetition escrow payments to prepetition advances (Complaint, ¶¶ 82, 90-93); (C) Rushmore's alleged failure to treat Ms. Pope's postpetition Monthly Mortgage Payments differently from the chapter 13 trustee's plan payments (Complaint, ¶¶ 82, 94-102); (D) Rushmore's alleged failure to send Ms. Pope monthly mortgage statements (Complaint, ¶¶ 82, 103-13); (E) Rushmore's alleged charge of certain preservation fees to Ms. Pope's account (Complaint, ¶¶ 82, 114-18); and (F) Rushmore's alleged failure to correct errors or properly answer Ms. Pope's questions regarding the status and treatment of the Loan (Complaint, ¶¶ 82, 119-25).  These allegations are properly framed as subparts of two overarching theories supporting Count III: (i) Rushmore's misapplication of payments and (ii) Rushmore's failure to send mortgage statements and information relating to the Loan upon Ms. Pope's written request.

Rushmore denies these allegations, primarily asserting that the Confirmation Order, which incorporates the "cure and maintain" provisions of the Plan, was not clear and unambiguous regarding the application of Ms. Pope's postpetition Monthly Mortgage Payments. In support, Rushmore cites the same language from the Plan that Ms. Pope relies upon. Rushmore maintains that its application of payments was not a violation of the Plan or Confirmation Order because it applied the payments "in the order of priority specified in the note and security agreement and applicable non-bankruptcy law" as required by the Plan and Section

2 of the Mortgage.[78]  Rushmore reasons that it applied the payments pursuant to the Plan because Ms. Pope's payments were applied without penalty despite the fact that Loan was not current. Rushmore similarly contends that the Plan was not clear and unambiguous as to its duty to send Ms. Pope monthly mortgage statements generally or without recoverable advances.

    1.  <u>Applicable Law</u>

    The court is empowered to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]"  11 U.S.C. § 105(a). "[The] court may invoke its contempt power under § 105" to enforce compliance with court orders. <u>Pittner v. Castle Peak 2011-1 Loan Tr. (In re Pittner)</u>, BAP NO. MB 17-021, 2018 WL 914691, at *9 (B.A.P. 1st Cir. Feb. 1, 2018).  <u>See also</u> <u>Ameriquest Mortg. Co. v. Nosek (In re Nosek)</u>, 544 F.3d 34, 43-44 (1st Cir. 2008); <u>In re Franklin</u>, 2017 BNH 011, 16.  Although § 105 "'provides the bankruptcy court broad authority to 'exercise its equitable powers . . . [,]'" it should wield it cautiously.  <u>In re Nosek</u>, 544 F.3d at 43.  As the First Circuit stated:

> Section 105(a) does not provide bankruptcy courts with a roving writ, much less a free hand.  The authority bestowed thereunder may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code.

<u>Jamo v. Katahdin Fed. Credit Union (In re Jamo)</u>, 283 F.3d 392, 403 (1st Cir. 2002) (citations omitted).

    "To prove civil contempt of a court order, the moving party 'must establish by clear and convincing evidence that a contemnor violated a court order.'"  <u>Pittner</u>, 2018 WL 914691 at *9

---

[78] Section 2 of the Mortgage states that: "all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each [Monthly Mortgage Payment] in the order in which it became due.  Any remaining amounts shall be applied to late charges, second to any other amounts due under [the Mortgage], and then to reduce the principal balance of the Note."  J.E. 1, § 2.

(quoting <u>Fatsis v. Braunstein (In re Fatsis)</u>, 405 B.R. 1, 7 (B.A.P. 1st 2009)).[79]  "The moving party must demonstrate that: '(1) the alleged contemnor had notice of the order, (2) the order was clear and unambiguous, (3) the alleged contemnor had the ability to comply with the order, and (4) the alleged contemnor violated the order.'"  <u>Id.</u> (quoting <u>Hawkins v. Dep't of Health & Human Servs. for N.H.</u>, 665 F.3d 25, 31 (1st Cir. 2012) (citation omitted) (internal quotations omitted)).  "To be held in contempt, a party 'must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion.'"  <u>Pittner</u>, 2018 WL 914691 at *10 (quoting <u>Baldiga v. C.A. Acquisition Corp. (In re Cyphermint, Inc.)</u>, 496 B.R. 49, 57 (Bankr. D. Mass. 2013)).

"Although the First Circuit has not explicitly ruled on the issue, courts within this circuit, including the [Bankruptcy Appellate] Panel, have concluded that a party's violation of a confirmation order can constitute sanctionable contempt under § 105(a)."  <u>Pittner</u>, 2018 WL 914691 at *9 (citing <u>In re Fatsis</u>, 405 B.R. at 11 (affirming bankruptcy court's finding that the debtor was in contempt for violating the order confirming his chapter 13 plan and its imposition of monetary sanctions under § 105(a)); <u>In re Franklin</u>, 2017 BNH 011, 17-19 (holding that the mortgagee was in contempt of the confirmation order for failing to properly account for mortgage payments and that the court could remedy such contempt under § 105(a))).  <u>See also</u> <u>In re Doolan</u>, 447 B.R. at 65-66 (finding that a town's failure to apply postpetition tax payments in accordance with terms of the debtor's confirmed plan was contempt of the confirmation order).  Moreover, where a party has been found in contempt of the court's order, "[a] willingness to correct past mistakes does not cure the nature of [the contemptor's] conduct[, h]owever, it may

---

[79] <u>But see</u> <u>In re Franklin</u>, 2017 BNH 011, 13 (stating that "[t]o prevail on the Motion for Contempt, the Debtor must establish by a preponderance of the evidence that: (1) the [creditor's] conduct violated some statutory provision or court order; and (2) that he suffered recoverable damages on account of the [creditor's] violative conduct").

be relevant to a determination of any sanctions to be imposed for such conduct." Id. at 66

(finding a town in contempt of confirmation order where it applied postpetition tax payments to

prepetition obligations despite the town's offer to reallocate the expenses however the debtor

wished).

The Supreme Court's decision in Taggart v. Lorenzen adds to the analysis. See 139 S.

Ct. 1795 (2019).  In Taggert, the Supreme Court held that a court may impose civil contempt

sanctions where a creditor attempts to collect a debt in violation of a chapter 7 bankruptcy

discharge order when "there is no objectively reasonable basis for concluding that the creditor's

conduct might be lawful under the discharge order."  Id. at 1801.  The First Circuit has not

addressed whether the "no-fair-ground-of-doubt" standard applies when a creditor acts contrary

to the terms of a confirmed chapter 13 plan.  This court concludes that it does.  An order is an

order and there is no meaningful difference between a violation of the discharge injunction in a

chapter 7 case as in Taggert and the violation of Ms. Pope's confirmed chapter 13 plan.  Though

not controlling, this court observes that other courts have applied the Taggert standard in cases

involving court orders other than the discharge order and in chapters other than chapter 7.  See

Beckhart v. NewRez LLC, 31 F.4th 274, 277 (4th Cir. 2022) (remanding case to the bankruptcy

court for application of the "no fair ground of doubt" standard to creditor's violation of the

debtor's chapter 11 plan of reorganization); In re Windstream Holdings, Inc., 627 B.R. 32, 40-

41(Bankr. S.D.N.Y. 2021) (applying "no fair ground of doubt" standard to contempt proceeding

for stay violation in a chapter 11 case); In re Caldwell, Case No. 18-32346-jda, 2019 WL

5616908, at *3 (Bankr. E.D. Mich. Oct. 30, 2019) (stating that it could not "discern any reason

why the [Taggert] standard should not apply equally to [the d]ebtor's request for civil contempt

sanctions for . . . alleged violations of [the] Court's turnover order"); In re Jones, CASE NO. 18-

02837-NPO, 2019 WL 5061166, at *4-5 (Bankr. S.D. Miss. July 22, 2019) (finding that

application of the "no fair ground of doubt" standard did not change its finding that the city was

in civil contempt of the court and that the debtor was entitled to damages arising out of the city's

violations of the automatic stay).

      2.  <u>Analysis</u>

      The parties do not dispute that Rushmore had notice of the Plan and Confirmation Order

and had the ability to comply with their provisions.[80]  Thus, the court must answer three

remaining questions.  Was the confirmed Plan clear and unambiguous?  Did Rushmore's conduct

violate the Plan and Confirmation Order?  Did Rushmore have an objectively reasonable basis to

conclude that its actions did not violate the terms of the Plan and Confirmation Order?

      The answers to these questions are "yes," "yes," and "no." The provisions of the

confirmed Plan are sufficiently clear and unambiguous so as to notify Rushmore of its

obligations (1) regarding the application of Ms. Pope's Monthly Mortgage Payments and the

chapter 13 trustee's plan payments, and (2) to deliver monthly mortgage statements and other

information about the Loan upon Ms. Pope's request.

      First, as discussed in the analysis of Counts I and II, Rushmore's application of Ms.

Pope's postpetition Monthly Mortgage Payments violated the Plan and Confirmation Order.[81]

This conclusion is supported by the evidence, the applicable provisions of the Bankruptcy Code,

and the unambiguous language of the Confirmation Order and Plan.

      Pursuant to § 1327(a) of the Bankruptcy Code, "the provisions of a confirmed plan bind

the debtor and each creditor . . . ."  11 U.S.C. § 1327(a).  Under § 1322(b)(5), a debtor's plan

may "provide for the curing of any default within a reasonable time and maintenance of

---

[80] <u>See</u> P.E. 75 (admissions 23 and 24).  Throughout this proceeding, Rushmore argued that its dual accounting methods and application of both Ms. Pope's Monthly Mortgage Payments and the chapter 13 trustee's plan payments complied with the Confirmation Order and Plan and was in line with industry standards.
[81] As noted above, the court finds that Rushmore applied a portion of Ms. Pope's postpetition escrow payments to cover prepetition escrow advances and a portion of at least two prepetition mortgage payments.

payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due."  11 U.S.C. § 1322(b)(5).  This "cure and maintain" provision bifurcates a debtor's payment obligation, allowing debtors to cure their prepetition mortgage arrears via plan payments through the chapter 13 trustee while maintaining direct postpetition payments to the lender at the contract rate.  See In re Franklin, 2017 BNH 011,16

"To effectuate [§ 1322(b)(5)], a mortgagee is required to apply regular payments made during the pendency of the [c]hapter 13 case to the current payments due and owing, and the arrearage payments from the [c]hapter 13 trustee to the prepetition arrears."  Id. (citing In re Doolan, 447 B.R. at 51).  The mortgagee's "[f]ailure to properly account for payments in this manner renders the mortgagee in contempt of the confirmation order."  Id.  As explained herein, the court may use its equitable powers under § 105(a) to "remedy such a contempt."  Id.

Here, the Plan had a "cure and maintain provision" as contemplated by § 1322(b)(5). The Confirmation Order, which incorporated the provisions of the Plan, explicitly required that postpetition mortgage payments "be applied and credited to [Ms. Pope's] mortgage account as if the account were current and no prepetition default existed on the petition date."[82]  This language is necessary to effectuate the § 1322(b)(5)'s "cure and maintain" provision, the significance of which Rushmore disregards.  The court is unpersuaded by Rushmore's assertion that subparagraph 1 of § 11, ¶ E of the Plan is ambiguous due to the sentence's second clause, which reads "in the order of priority specified in the note and security agreement and applicable non-bankruptcy law."  This sentence plainly refers to the order of priority outlined in the first sentence of Section 2 of the Mortgage, which states that "all payments accepted and applied by

---

[82] See J.E. 7, § 11, ¶ E, 1.

[Rushmore] shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3."[83]  Thus, the Confirmation Order required Rushmore to apply postpetition payments as if the account was current (i.e, to the next postpetition payment due), in the order of priority outlined in Section 2 of the Mortgage. This is buttressed by the language of subparagraph 2 of § 11, ¶ E of the Plan: "if a creditor applies payments in a manner not consistent with the terms of this plan . . . such actions may be a violation of 11 U.S.C. § 524(i)."  Section 524(i) states:

> "*[t]he willful failure of a creditor to credit payments received under a plan confirmed* under [the Code], unless [one of three events not relevant to this proceeding occur] *shall constitute a violation of an injunction* under subsection (a)(2) if the act of the creditor to collect and *failure to credit payments in the manner required by the plan* caused material injury to the debtor."

11 U.S.C. § 524(i) (emphasis added).  In sum, Rushmore's suggested reading of subparagraph 1 of § 11, ¶ E of the Plan makes sense only in isolation and without regard to the provisions of the Plan and Confirmation Order.

Turning to Ms. Pope's second overarching contempt theory, the court finds that Rushmore also violated the Confirmation Order by failing to send Ms. Pope mortgage statements from October of 2016 through June of 2018.[84]  Section 11, ¶ F of the Plan imposed a duty on Rushmore to provide Ms. Pope and/or her attorney, upon written request, "all information with respect to [Ms. Pope's] mortgage loan as it would provide absent a bankruptcy proceeding, including contractual monthly payment changes."[85]  As previously noted, this section's definition of "information" is broad and not limited to monthly statements.  To promote

---

[83] See J.E. 1 at 4.

[84] See P.E. 75 (admissions 41-43, 45,5 50-54, 58, 59, 62, 77, 79, 83-89).

[85] See J.E. 7, § 11, ¶ F, 1.

compliance with this obligation, the section enjoins debtors from asserting a "claim against the mortgage servicer, the secured creditor, or their successors for any violation of the automatic stay or any discharge injunction resulting from its compliance with this section."

Ms. Pope's attorney sent Rushmore and/or its attorney multiple written requests for information that is well within the scope of the required disclosures. As with its reading of § 11, ¶ E of the Plan, Rushmore's construction of 11, ¶ F of the Plan creates ambiguity where none exists. Rushmore reasons that it was not required to send the monthly mortgage statements because they were based on the contractual accounting of the Mortgage and believed that they were not helpful to Ms. Pope. In support, Rushmore cites the definition of the term "information" as used in the section, which states in relevant part that "'information' as used herein includes, but is not limited to, . . . monthly statements *that help the debtor properly make monthly payments*." (emphasis added).[86] Rushmore's focus on the phrase "helps the debtor . . ." disregards the first sentence's mandate to provide "all information" and the nonexclusive list of "information." As the parties stipulated to prior to trial, Rushmore failed to send mortgage information to Ms. Pope for more than 26 months: July 2016, and then again beginning in October 2016 through October of 2018.

    3.  Appropriate Damages

In the exercise of its discretion, and based upon Rushmore's previously described conduct, this court concludes that an award in favor of Ms. Pope and against Rushmore in the amount of $10,000 is the proper remedy. In awarding this amount, the Court is focused primarily on Rushmore's failure to deliver the information about the Loan to Ms. Pope after she requested it and as specifically set forth in the Confirmation Order. It was not Rushmore's place

---

[86] See J.E. 7 at 4.

to unilaterally withhold the information merely because it believed the information confused Ms. Pope.

    D.  <u>Count V: Rule 9011 Sanctions</u>

In Count V (Complaint, ¶¶ 148 – 155), Ms. Pope asserted that the court should sanction U.S. Bank pursuant to Federal Rule of Civil Procedure 9011(c) for failing to withdraw what she alleged to be contradictory Notices and to file with the court Notices that Rushmore Sent to her (Complaint, ¶¶ 148-55).  In her post-trial briefing, Ms. Pope explained that her request for sanctions pursuant to Federal Rule of Civil Procedure 9011 relies on an alternative theory of the case.[87]  Specifically, that she sought sanctions under this Rule "in the event that Rushmore was able to prove that it had applied funds as described in [an expert report that it did not seek to admit during the trial]."  Because Rushmore did not seek to admit that report, and in light of this court's finding that Rushmore misapplied escrow funds as evidenced by Rushmore's Account Activity Statements, Escrow Statements, tax statements or forms, and mortgage statements, the court denies the relief sought by Ms. Pope in Count V.

## V.  CONCLUSION

This opinion constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The court will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.


Date:   August 15, 2022                   /s/ Peter G. Cary
                                                   Peter G. Cary
                                                   United States Bankruptcy Judge
                                                   District of New Hampshire (by designation)

---

[87] <u>See</u> Doc. No. 286 at 18.